# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**MILLS LAW GROUP LLP,**

     *Plaintiff,*

**v.**

                             **Case No. 1:22-CV-3323-RCL**

**REPUBLIC OF IRAQ**
and
**MINISTRY OF JUSTICE OF THE
REPUBLIC OF IRAQ,**

     *Defendants.*

## MEMORANDUM OPINION

     Mills Law Group ("MLG") has represented the Republic of Iraq in its longstanding litigation against Wye Oak Technologies, Inc. before this Court.  *See Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-cv-1182-RCL, 2019 WL 4044046 (D.D.C. Aug. 27, 2019) ("*Wye Oak I*").  In this action, MLG seeks payment of attorney's fees owed for services it provided to Iraq in *Wye Oak I*.  MLG has sued both Iraq and Iraq's Ministry of Justice ("MoJ") for payment of the twenty-five invoices it has sent Iraq.  MLG has complied with the service provisions of the Foreign Sovereign Immunities Act (FSIA) and moved for default judgment.  For the reasons that follow, the Court will grant MLG's motion.

## I.    FINDINGS OF FACT

### A.  Judicial Notice of The *Wye Oak I* Docket

     MLG asks that the Court take judicial notice of the docket in *Wye Oak I*.  Stmt. Of Supporting Ev. 4, Mot. for Default J. Ex. 3, ECF No. 12-4.  The Federal Rules of Evidence allow a court to take judicial notice of facts that are "not subject to reasonable dispute" either because they are "generally known within the trial court's territorial jurisdiction" or because they "can be

accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court may take "judicial notice of court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp 2d 163, 171 (D.D.C. 2010) (citing *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938)). While courts tend to avoid taking judicial notice of prior proceedings simply to accept the "truth of [an] earlier court's findings and conclusions," the validity of the judicial record itself—in this instance, for example, the fact that an attorney appeared on the record or subsequently withdrew their representation—is generally "not subject to dispute." *Id.* at 172.

The Court will take judicial notice of several facts from the docket in *Wye Oak I*. First, Iraq was served with a summons and complaint in the Wye Oak litigation under cover of diplomatic note on January 13, 2010, in accordance with the FSIA's service provisions. 28 U.S.C. § 1608(a)(4). MLG's named partner, Timothy Mills, made an original notice of appearance as counsel for Iraq for the first time on March 4, 2010. Notice of Appearance, *Wye Oak I*, ECF No. 17. At that time, Mills was a partner at the law firm Maggs & McDermott. *Id.* Mills took over as lead counsel shortly thereafter on August 10, 2010. Notice of Appearance, *Wye Oak I*, ECF No. 48. On September 1, 2021, Mills filed a motion to withdraw as counsel for Iraq in the Wye Oak litigation. Mot. to Withdraw as Attorney, *Wye Oak I*, ECF No. 518. The Court granted the motion the next day. Order, *Wye Oak I*, ECF No. 519. Having taken judicial notice of these docket entries from *Wye Oak I*, the Court will proceed to enter the following findings of fact.

**B. MLG's Engagement with Iraq and Demands for Payment**

MLG is a limited liability partnership based in Washington, D.C. Compl. ¶ 5(A). Its named partner, Timothy B. Mills, first entered into an agreement for services with Iraq ("Initial Engagement Agreement") on February 20, 2010, effective February 18, 2010, which was shortly

after Iraq received notice of Wye Oak's suit against it. Initial Engagement Agreement 1, Compl. Ex. 1.2, ECF No. 5-2.[1] Mills agreed to "represent and defend the Government of Iraq" in the Wye Oak litigation. *Id.* When Mills left Maggs & McDermott on March 25, 2018, he entered into a new engagement agreement ("MLG Engagement Agreement") with Iraq to continue his representation of them with his new firm—the plaintiff in this case, MLG. MLG Engagement Agreement, Compl. Ex. 1.1.

The MLG Engagement Agreement laid out several terms relevant to this litigation. First, in exchange for legal services provided by MLG, the MLG Engagement Agreement required Iraq to pay in advance "a retainer . . . in the amount of US$100,000 for [their] representation in this case" and it further required that the retainer "must be replenished by prompt payment in full of invoices to which retainer funds have been applied." *Id.* at 2. Second, the MLG Engagement Agreement incorporated the Standard Terms of the Initial Engagement Agreement between Iraq and Maggs & McDermott. *Id.* at 4. Incorporation of these Standard Terms meant that Iraq was required to pay MLG ahead of time for any litigation expenses incurred by MLG on behalf of Iraq. *Id.* Third, the MLG Engagement Agreement set out legal fees and determined the billing rate would range from $95 per hour (for legal assistants) to $650 per hour (for Mr. Mills himself). *Id.* at 2. Finally, the MLG Engagement Agreement required that Iraq pay MLG for "incurred fees and expenses" by wire transfer "not later than sixty (60) days after delivery of each invoice" to Iraq. *Id.* at 3. In sum, Iraq owed a duty to MLG to: i) pay an upfront retainer of $100,000 and replenish that retainer when its funds were applied to invoices; and ii) pay all Litigation Invoices for legal expenses and fees within sixty days of their Presentment Date.

---

[1] The allegations in the Complaint have been attested to under oath by Mr. Mills. *See* Mills Decl. ¶ 4.

The Director General of the Legal Department for Iraq's Ministry of Justice signed the MLG Engagement Agreement on behalf of Iraq. *Id.* at 5. After signing the agreement, Iraq made several payments to MLG. First, Iraq sent Embassy Check No. 16767 dated August 30, 2018, for $150,000. Pl.'s Bus. Records 1518, ECF No. 13-2. Second, Iraq sent Embassy Check No. 16933 dated November 14, 2018, for $100,000. *Id.* at 1521. Third, Iraq sent Embassy Check No. 17080 dated December 27, 2018, for $27,596.48. *Id.* 1524. This final payment was made to satisfy a discovery sanction issued by this Court in the Wye Oak litigation. Order, *Wye Oak I*, ECF No. 350. Therefore, the record reflects that Iraq has remitted $277,596.48 in total payment to MLG for expenses and legal fees. The record reflects no further payment by Iraq to MLG after the December 27, 2018 payment in satisfaction of this Court's sanction.

In total, MLG sent twenty-five invoices to Iraq between October 12, 2019 to December 9, 2021. *See generally* Compl. Annex A. For its part, MLG continued to perform under the MLG Engagement Agreement despite Iraq's failure to pay the invoices. Stmt. Undisputed Facts ¶ J-10(B), Mot. for Default J., ECF No. 12-7. In an attempt to collect invoices, MLG sent eighteen emails demanding payment from Iraq, with the last of these communications sent on July 25, 2022. *Id.* Annex B at B-112. After MLG withdrew from its representation of Iraq in the Wye Oak litigation, it initiated this action against Iraq on October 30, 2022. Compl. 25. Seeking an amicable resolution, MLG continued to write Iraq seeking payment of their outstanding invoices, sending eight additional emails between November 2022 and the filing of this Motion for Default Judgment in October 2023. Stmt. Undisputed Facts ¶¶ I-6 ((B)(1)–(8)).[2]

---

[2] This paragraph of the Statement of Undisputed Facts incorporates evidence filed under seal. 2nd Certificate, Ex. ABS-1, 3, 6, 7, 9, 11, 13, ECF No. 13-2 at 429–41; 451–72; 500–946; 1362–70; 1383–1402; 1408–30; 1433–57; 1467–94.

## II.   PROCEDURAL HISTORY

MLG commenced this civil action on October 30, 2022.  Compl. 25.  The Complaint contains four counts against Iraq and MoJ.  *Id.* ¶¶ 29–59.  Count I alleges that Iraq has accepted each Delinquent Invoice as correct in accordance with D.C. law of account stated.  *Id.* ¶¶ 29–38. Count II alleges in the alternative that Iraq materially breached the MLG Engagement Agreement by failing to pay the delinquent invoices and failing to maintain a retainer with MLG.  *Id.* ¶¶ 39– 42.  Count III alleges a breach of the implied covenant of good faith and fair dealing under D.C. law.  *Id.* ¶¶ 42–55.  Count IV asks in the alternative for an award under a theory of quantum meruit. *Id.* ¶¶ 56–59.

While MLG continued seeking payment from Iraq, it began the process of serving Iraq in accordance with the FSIA.  The FSIA provides plaintiffs four methods for serving a defendant. 28 U.S.C. § 1608(a).  Plaintiffs must attempt these methods in order, and thhe D.C. Circuit requires "strict adherence" to these terms.  *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994).  Under the first method of service, a plaintiff should follow "any special arrangement" for service—e.g., a contractual provision—between the plaintiff and the foreign state.  28 U.S.C. § 1608(a)(1).  Here, neither the Initial Engagement Agreement nor the MLG Engagement Agreement had any such special arrangement, so MLG did not have an option to effect service via § 1608(a)(1).  Second, a plaintiff may serve the defendant state "in accordance with an applicable international convention" on service of process.  *Id.* § 1608(a)(2).  However, the United States and Iraq are not party to any such international convention.[3]

---

[3] Conventions like the International Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("ICSID Convention") have been found to confer subject matter jurisdiction on this court in the past.  *ConocoPhillips Petrozuata B.V. v. Bolivarian Republic of Venezuela*, 628 F. Supp. 3d 1 (D.D.C. 2022). However, a review of diplomatic relations between the United States and Iraq shows there is no applicable convention in this case.

MLG therefore attempted service on Iraq under the third option, which permits service "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring signed receipt." § 1608(a)(3). MLG began by filing an affidavit requesting foreign mailing on November 10, 2022. Aff. Requesting Foreign Mailing, ECF No. 6. On November 15, 2022, the Clerk of the Court certified that they mailed a copy of the summons, complaint, and notice of suit, along with a translation of each into the official language of Iraq, via FedEx. Cert. of Mailing, ECF No. 8. Iraq received these documents at the Ministry of Foreign Affairs in Baghdad, Iraq on November 23, 2022. Proof of Service by Foreign Mailing 7, ECF No. 9. Iraq did not answer this Complaint within sixty days of service, and MLG subsequently filed an affidavit in support of default on January 24, 2023, Aff. In Support of Default. ECF No. 10. The Clerk of the Court filed Entry of Default the same day. Entry of Default, ECF No. 11.

Therefore, MLG has successfully served Iraq in accordance with the FSIA.

### III.    LEGAL STANDARDS

The Federal Rules of Civil Procedure and FSIA together establish the standard a court must apply in determining whether to award default judgment to a plaintiff. Federal Rule of Civil Procedure 55(a) requires the Clerk of the Court to enter a party's default if the party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a).

Under the FSIA, a court may not enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish their claim or right to relief. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). But this

requirement is not a free pass for courts to summarily accept plaintiff's assertions as true. Instead, courts are required to "inquire further before entering judgment" against parties in default. *Rimkus*, 750 F. Supp 2d at 171 (citing *Oveissi v. Republic of Iran*, 498 F. Supp. 2d 268, 272). This Court has said in the past that it can rely on, among other things, plaintiffs' "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 52, 59 (D.D.C. 2010) (quoting *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)).

## IV.    CONCLUSIONS OF LAW

The Court will first address why it has subject matter jurisdiction over this case under the FSIA commercial activity exception. Next, the Court will discuss the basis for exercising personal jurisdiction over Iraq. The Court will then briefly discuss why venue in the District of Columbia is proper, which will lead into the Court's choice-of-law analysis. This analysis will review D.C. substantive law on both the issues of account stated and D.C. contract law principles. Finally, the Court will turn to liability under D.C. law and an award of damages.

### A.  Subject Matter Jurisdiction

The FSIA confers on the district courts "original jurisdiction without regard to amount in controversy of any [1] nonjury civil action [2] against a foreign state [3] as to any claim for relief in personam [4] with respect to which the foreign state is not entitled to immunity" under the FSIA. 28 U.S.C. § 1330(a). The Court has subject matter jurisdiction to hear this nonjury civil action against Iraq and MoJ because Iraq's sovereign immunity is waived under two provisions in the FSIA's "commercial activity" exception. The civil action is based on a commercial activity carried on in the United States and, even if not, it is based on an act outside of the United States that has a direct effect on the United States. Either of these bases waives Iraq's sovereign immunity and

therefore provides the Court with subject matter jurisdiction under the FSIA.  28 U.S.C. § 1605(a)(2).

MLG explicitly did not demand a jury trial in its Complaint for the breach of contract claims, so the first prong of subject matter jurisdiction is satisfied.  Civ. Cover Sheet, ECF No. 1-1.  Regarding the second prong, the FSIA includes in its definition of foreign states any "agency or instrumentality of a foreign state," an agency or instrumentality of a state being "a separate legal person . . . which is an organ of a foreign state or political subdivision thereof."  *Id.* § 1603(a)–(b)(2).  Both defendants, Iraq and MoJ, fall within the definition of a foreign state for the purposes of exercising subject matter jurisdiction.  With respect to the third prong, MLG seeks in personam relief directly against Iraq and MoJ.  Therefore, the only issue the Court must analyze in more detail is whether Iraq and MoJ are nevertheless entitled to immunity.

The FSIA presumes that foreign sovereigns are immune from litigation in federal district court.  Except as laid out in §§ 1605–1607 of the FSIA, foreign states "shall be immune from the jurisdiction of the courts of the United States."  28 U.S.C. § 1604.  "Even if the foreign state does not enter an appearance," a district court must assure itself that one of the exceptions in sections 1605–1607 is present before it can adjudicate the underlying substantive claims.  In this case, the relevant exception to foreign sovereign immunity is the commercial activity exception, found at 28 U.S.C. § 1605(a)(2).  The exception has three disjunctive prongs, only one of which must be satisfied for a court to exercise subject matter jurisdiction over a civil action against a foreign state.  Namely, a foreign state is not immune if the civil action:

> [1] is based upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

*Id.*

Here, MLG asserts that the first and third prongs of § 1605(a)(2) provide subject matter jurisdiction over their claims. Mot. for Default J. 5–6, ECF No. 12-1. Both of these prongs concern the carrying on of "commercial activity." The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d).

### 1. Iraq's Sovereign Immunity is Waived Under Prong One of § 1605(a)(2)

MLG alleges that the MLG Engagement Agreement constitutes a commercial activity "carried on in the United States by" Iraq sufficient to confer subject matter jurisdiction on this court. Mot. for Default J. 5. Specifically, MLG claims that "contracting for the provision of legal services in the United States constitutes 'commercial activity' of the foreign sovereign defendant . . . sufficient to bestow the Court with FSIA subject matter jurisdiction under the first prong" of § 1605(a)(2). Mot. for Default J. 5–6.

Invocation of the commercial activity exception presents the court with a "classification question." *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1549 (D.C. Cir. 1987). A court must determine that the disputed contract between a plaintiff and foreign sovereign was not a "governmental" contract but was instead a commercial activity of such a kind that a private person could enter. *Id.* at 1548–49. And while "[a] contract between a foreign state and a private party for the purchase of goods or services may presumptively be . . . a commercial activity," it is not "inevitably" one. *Id.* at 1551. The key question is "whether the foreign sovereign's contract at issue is 'of the same character as a contract which might be made by a private person.'" *Id.* at 1550 (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 16 (1976), *reprinted in* 1976 U.S. CODE CONG. & ADMIN.NEWS 6604, 6615).

The Court agrees that the MLG Engagement Agreement is sufficient to invoke the commercial activity exception under the first prong. As other courts in this district have recognized, retaining an attorney through a contract like the MLG Engagement Agreement is a type of activity by which private parties engage in commerce. *Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17, 27 (D.D.C. 2017) (first citing *Embassy of Federal Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 141 (D.D.C. 2012); and then citing *Reichler, Milton & Medel v. Republic of Liberia*, 484 F. Supp. 2d 1, 2 (D.D.C. 2007)). Here, there is clear evidence that Iraq entered the MLG Engagement Agreement for the express purpose of retaining MLG as counsel to defend it in the Wye Oak litigation. Therefore, this civil action "is based on" a commercial activity—i.e., the MLG Engagement Agreement—and the Court has subject matter jurisdiction to hear the underlying claims under the first prong of § 1605(a)(2).

### 2. Iraq's Sovereign Immunity is Waived Under Prong Three of § 1605(a)(2)

MLG claims in the alternative that Iraq's failure to pay legal fees and expenses by wire transfer to MLG's bank account caused a direct effect in the United States sufficient to satisfy the third prong of § 1605(a)(2). *Id.* at 6. The Supreme Court's "leading case on the FSIA's direct effect requirement" is *Republic of Argentina v. Weltover*, 504 U.S. 607 (1992). *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1189 (D.C. Cir. 2003). In *Weltover*, Argentina had issued bonds to creditors, called "Bonods," which were payable in U.S. dollars in, at the election of the creditors, New York. *Weltover*, 504 U.S. at 609–10. The Supreme Court held that because New York was designated by the creditors as the place of performance for Argentina's obligations on the bonds, Argentina's rescheduling of the bond repayment had a direct effect in the United States. *Id.* at 619.

MLG cites to a D.C. Circuit opinion authored by then-Judge John Roberts in which the court, relying on *Weltover*, held that "a foreign sovereign's failure to make a contractually required deposit in a bank in the United States meets the statute's definition of a 'direct effect.'" *I.T. Consultants*, 351 F.3d at 1186. In *I.T. Consultants*, Pakistan failed to pay the plaintiffs on a contract under which the plaintiffs had performed. *Id.* The original agreement between Pakistan and the plaintiffs "was silent on the place of payment," but because the plaintiffs had sent a letter to Pakistan three weeks after execution of the contract requesting payment to a bank account in Alexandria, Virginia, "the involvement of a U.S. bank was immediate and unavoidable." *Id.* at 1190–91. The court found that Pakistan's "failure to meet its payment obligation under such a contract" qualified as an act that caused a "direct effect" in the United States. *Id.*

In the Wye Oak litigation from which the present action stems, the D.C. Circuit provided additional context to the "direct effect" requirement of the third prong of § 1605(a)(2). There, the D.C. Circuit held that the third prong did *not* confer subject matter jurisdiction on this Court to decide Wye Oak's breach-of-contract claims because "Wye Oak and [Iraq] fully anchored their relationship in Iraq." *Wye Oak Tech., Inc. v. Republic of Iraq*, 109 F.4th 509, 516 (D.C. Cir. 2024). The Circuit held that "because Wye Oak asked for the payment [under its contract with Iraq] to be made in Iraq, not in the United States, and not to a United States bank," there was no direct effect in the United States. *Id.* Indeed, Wye Oak's invoices to Iraq "designated the Ministry's Baghdad office as the place of payment." *Id.* at 513 (citing *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-cv-1182-RCL, 2022 WL 17820569, at *6–7 (D.D.C. Dec. 20, 2022)).

Perhaps having learned from its representation of Iraq in the Wye Oak litigation, MLG has avoided Wye Oak's fatal error. While the MLG Engagement Agreement does not explicitly require payment be made to a specific bank in the United States, it does require MoJ to "make

payment of the retainer . . . and the Firm's invoices by wire transfer of funds . . . to the account of Mills Law Group LLP . . . in accordance with the banking instructions on the invoices." MLG Engagement Agreement 3. And every invoice introduced into evidence instructs MoJ to make payment to the same financial institution in Washington, D.C. *See generally* Pl.'s Bus. Records. Like the plaintiffs in *I.T. Consultants*, who similarly relied on a document created *after* the contract was signed to demonstrate a direct effect in the United States, MLG has provided evidence of documents created after the contract was signed with Iraq to demonstrate a direct effect.

The banking instructions found on each invoice in this case are just like the banking instructions in the letter sent by the plaintiffs in *I.T. Consultants* after executing their initial agreement with Pakistan. *See I.T. Consultants*, 351 F.3d at 1187. The MLG Engagement Agreement's requirement that MoJ remit payment to MLG's bank account, combined with invoices clearly designating MLG's bank account in Washington D.C. as the place of payment, open the door for performance or non-performance of the contract to have a direct effect in the United States. And Iraq's failure to pay any of these invoices has a direct effect on the United States sufficient to establish subject matter jurisdiction under the third prong.

Because the commercial activity exception to sovereign immunity applies to this civil action, Iraq and MoJ are "not entitled to immunity." 28 U.S.C. § 1330(a). Since this is a nonjury civil action against a foreign state, and since MLG seeks a claim for relief in personam, the Court can exercise subject matter jurisdiction over this action.

**B. Personal Jurisdiction**

The FSIA provides a simple formula for establishing personal jurisdiction: once a district court has subject matter jurisdiction under § 1330(a) and service has been completed under § 1608, personal jurisdiction exists. 28 U.S.C. § 1330(b). The D.C. Circuit has helpfully recast the statutory requirements: "[S]ubject matter jurisdiction plus service of process equals personal

jurisdiction." *Practical Concepts*, 811 F.2d at 1548 n.11. Because MLG has served Iraq and the Court is satisfied it has subject matter jurisdiction, the Court necessarily has personal jurisdiction over Iraq and MoJ as well.

### C.  Venue

Venue is proper in the United States District Court for the District of Columbia for all civil actions "against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f)(4).  As discussed, both Iraq and MoJ fall within the definition of a foreign state under FSIA. *See* 28 U.S.C. § 1603(a). Since Iraq and MoJ are both foreign states, the Court concludes that venue is proper in this district.

### D.  Choice of Law

Having found that the Court has both subject matter and personal jurisdiction to decide this case and that venue is proper in this District, the Court now turns to a choice of law analysis to determine which law should govern the interpretation of the MLG Engagement Agreement.  The FSIA provides that a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.  Relying on this language, the D.C. Circuit has noted that "if an FSIA exception abrogates immunity," as is the case here, then "plaintiffs may bring state law claims that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009).  In this case, MLG's claims are for breach of contract and therefore center solely on state substantive law.  Courts in the D.C. Circuit "considering issues governed by state substantive law in FSIA cases should apply the choice-of-law rules of the forum state." *Id.*  And as discussed, District of Columbia is the proper venue for the present action.  The Court will therefore apply

District of Columbia choice-of-law principles and conclude that D.C. law, rather than Iraqi law, governs the MLG Engagement Agreement.[4]

District of Columbia courts apply a "constructive blending" of the governmental interest analysis and most significant relationship test in their choice-of-law analysis, in recognition of the fact that a state with the most significant relationship to a transaction "should also be the state whose policy is advanced by application of [its] law." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41n. 18 (D.C. 1989) (citing an observation made by Judge Joyce Green). Courts analyzing breach-of-contract claims under D.C. law consider the five factors outlined in the Restatement: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance of the contract, (4) the location of the subject matter of the contract[,] and (5) the place of incorporation and the place of business of the parties." *Kroger v. Legalbill.com*, 436 F. Supp. 2d 97, 104 (D.D.C.); Restatement (Second) of Conflict of Laws § 188(2) (1971). The factors "are to be evaluated according to their relative importance with respect to the particular issue," and when the place of negotiation and the place of performance are the same state, "the local law of [that] state will usually be applied." Restatement (Second) of Conflict of Laws § 188(2), (3).

Here, MLG asks the Court to find that each of these five factors favors application of the D.C. law of account stated. The Court, in conducting its own review of the factors, finds them to be more of a mixed bag, but ultimately agrees that D.C. law applies. The first, second, and fifth factors are at best neutral. MLG entered into the MLG Engagement Agreement from its Washington, D.C. office, and MLG's negotiation of the contract terms with Iraq and MoJ took place via email from MLG's Washington, D.C. headquarters. However, Iraq signed the agreement

---

[4] Although MLG does not raise this point, the Court will presume that Iraqi law and D.C. law differ as to the application of state law to a breach-of-contract claim. *See Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985) ("Under District of Columbia principles, we must first determine whether there is a conflict between the laws of the relevant jurisdictions.").

and negotiated from Iraq.  Additionally, while MLG's principal place of business is Washington, D.C., MoJ's principal place of business is Iraq.  So as between Washington, D.C., and Iraq, the first, second, and fifth factors do not tip the scales.

However, the third factor (place of performance of the contract) and fourth factor (location of the subject matter of the contract) lean heavily in favor of applying D.C. law.  The subject matter of the MLG Engagement Agreement was "representation and defense of the Republic of Iraq . . . and the Ministry of Defense of the Republic of Iraq" in the Wye Oak litigation.  MLG Engagement Agreement 1.  And the legal services required to mount such a defense—both in MLG's offices and through its representation of Iraq and MoJ in court—took place almost exclusively in Washington, D.C.  MLG's "performance of the invoiced Legal Services and . . . incurrence of the invoiced Expenses . . . took place primarily in Washington[,] D.C."  Mot. for Default J. 15.  And just as importantly, every court appearance for which MLG billed Iraq and MoJ took place in this Court and in the D.C. Circuit.

Given these facts, the Court finds that D.C. law appropriately governs the MLG Engagement Agreement and controls MLG's claims related to the Agreement.

**E.  Liability Under D.C. Law**

Recall that MLG sued Iraq on four counts: Count I alleges a breach of Iraq's legal obligation to pay the account stated on the litigation expense invoices and litigation legal fees invoices; Count II alleges a breach of contract claim under D.C. law; Count III alleges a breach of the implied covenant of good faith and fair dealing; and Count IV seeks in the alternative an Order from this Court declaring that Iraq pay MLG an amount equal to the invoiced expenses and legal fees under a theory of quantum meruit.  The Court will consider each of these counts in turn.

### 1. Account Stated

"An account stated is 'a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due.'" *Eagle Maint. Servs., Inc. v. D.C. Contract Appeals Bd.*, 893 A.2d 569, 582 (D.C.2006) (quoting *Ally & Gargano, Inc. v. Comprehensive Acct. Corp.*, 615 F. Supp. 426, 428–29 (S.D.N.Y.1985)). Before an account can be stated, it must be *rendered*, which typically happens when a creditor like MLG renders an accounting of outstanding charges to a debtor like Iraq, who owes the creditor money for services provided.

When, as here, an outstanding account rendered to a debtor on a contract remains unpaid, it becomes an account stated. Determining when an account rendered converts to an account stated—and thereby provides a basis for a plaintiff to commence a civil action to recover on the outstanding balance—"is a question of law for the court." *Id.* In one of the earliest federal cases to deal with this state-law claim, the United States Supreme Court found that a failure to object to an account stated for three to four months (from "September, 1875 . . . until January, 1876) "made it an admission . . . of its correctness." *Standard Oil Co. v. Van Etten*, 107 U.S. 325, 330 (1882). More recently, this Circuit has found that a "failure to specifically challenge" a final invoice "for two months when it appeared that the creditor was insisting on payment" was sufficient to find that an account rendered had converted to an account stated. *Reed Research, Inc. v. Schumer Co.*, 243 F.2d 602, 605 (D.C. Cir. 1957). If an account is rendered "and not objected to within a reasonable time, [it] is to be regarded as admitted to be correct" and becomes an account stated. *Riley v. Mattingly*, 42 App. D.C. 290, 294 (D.C. 1914).

Here, MLG sent invoices to Iraq beginning on October 12, 2019. Compl. Annex A at A-1. The MLG Engagement Agreement provided Iraq sixty days from the presentment of each invoice to make a full payment by wire transfer. MLG Engagement Agreement 3. Iraq sent periodic responses to MLG regarding the billing of these invoices, none of which presented a

legally cognizable objection to any specific invoice. Nor was any response by Iraq sent within an amount of time to prevent MLG's account rendered from becoming an account stated.

The first correspondence in the record from MoJ regarding invoices was sent on May 12, 2020. Pl.'s Bus. Records 62. In that email, MoJ did not dispute or object to any of the previously invoiced legal fees—indeed, MoJ informed MLG that the invoices had "been presented before the high authorities." *Id.* Because the MLG Engagement Agreement provided Iraq sixty days to pay invoices, and because this Circuit has found two months to be long enough for an account rendered to convert to an account stated so long as a creditor is actively pursuing payment, the Court concludes that no objections were raised to any invoices sent prior to March 12, 2020, and those accounts rendered were converted to accounts stated.

The first response from Iraq that could be considered a legally cognizable objection to any of MLG's invoiced legal fees came on September 14, 2021. Pl.'s Bus. Records 337–38. There, Iraq asked that MLG refrain from pursuing legal action while Iraq worked with Ernest & Young "to audit [MLG's] fees for the period from 1st of March 2018 till 1st September 2020." *Id.* MLG responded immediately rejecting this offer and clarifying that it would be amenable to an "Alternative Dispute Resolution . . . to resolve Iraq's . . . continuing breach of obligations to pay Mills Law Group's outstanding invoices, pre-judgment interest, and other consequential damages." *Id.* at 331.

On December 8, 2021, Iraq emailed MLG notifying it that exactly one invoice, No. 21-0807-001, had been audited and that Iraq believed "the amount of the invoice [was] very high." *Id.* at 434. This seems to be the first time Iraq objected to any invoice. But as MLG points out, the objection came four months after the invoice was initially sent. *Id.* (noting that the referenced invoice was sent by MLG on August 8, 2021). Regardless of whether this objection was legally

cognizable (a determination this Court need not reach), the objection came two months too late to prevent the account rendered on August 8, 2021, from becoming an account stated by the time of the objection on December 8, 2021.  MLG sent its final invoice on December 9, 2021.  Compl. Annex A at A-1.  MLG continued its demands for payment from Iraq for all outstanding invoices through July 25, 2022.  Stmt. of Undisputed Facts ¶ I-6.A.  Iraq did not respond to any of these demands.

In sum, the Court finds no evidence that Iraq objected to any invoiced legal expenses or fees other than Invoice No. 21-0807-001.  And for the reasons stated above, that objection, regardless of whether it is legally cognizable under the D.C. law of on account stated, came from Iraq too late to have prevented the account rendered on August 8, 2021 from becoming an account stated.  For these reasons, the Court holds that Iraq and MoJ are liable to MLG on all outstanding invoices under a theory of account stated.

### 2.  Breach of MLG Engagement Agreement

MLG also claim that Iraq's failure to pay the invoices within sixty days of their presentment constituted a material breach of the MLG Engagement Agreement.  Compl. ¶ 39–42.  To prevail on a breach of contract claim under D.C. law, a plaintiff must prove that "(1) a valid contract between the parties [existed]; (2) an obligation or duty [arose] out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).

Here, MLG and Iraq entered into a valid agreement on March 25, 2018, which was effective February 19, 2018.  MLG Engagement Agreement 5.  The MLG Engagement Agreement was signed by Timothy Mills, on behalf of MLG, and by Raad Khalil Ghajy, on behalf of Iraq.  *Id.* at 5.  Pursuant to the contract, MLG owed Iraq a contractual duty to: (i) represent Iraq and the Iraq Ministry of Defense in the Wye Oak litigation, and (ii) present invoices with itemized fees and

expenses to MoJ for approval and payment either monthly or when unbilled fees and expenses total at least $15,000. *Id.* at 3. Iraq, meanwhile, owed MLG a contractual duty to (i) maintain a retainer of $100,000 with MLG "throughout the representation"; and (ii) pay MLG's invoices by wire transfer "by the payment due date, in accordance with banking instructions on the invoices." *Id.* at 2–3.

The evidence shows that MLG fully performed all duties under the MLG Engagement Agreement. First, MLG has made a prima facie showing that it performed legal services for Iraq in accordance with the MLG Engagement Agreement. Mot. for Default J. ¶ II-4. MLG sent invoices to Iraq at regular intervals throughout the course of litigation. *See generally* Pl.'s Bus. Records. Given that the final invoice was presented to Iraq on December 9, 2021, Iraq was in material breach of the MLG Engagement Agreement as to all outstanding invoices sixty days later, or on February 8, 2022.

MLG has proven that a valid contract existed, that Iraq and MLG both had obligations that arose from that contract, and that Iraq breached its contractual duties to MLG. As discussed further *infra*, MLG has also been damaged by Iraq's breach. For these reasons, the Court finds that Iraq materially breached the MLG Engagement Agreement and MLG is entitled to damages for that breach.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing

The courts of the District of Columbia recognize an "implied duty of good faith and fair dealing" present in every contract. *Paul v. Howard*, 754 A.2d 297, 310 (D.C. 2000). Under this duty, parties to a contract covenant that they will not "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988)).

Here, the fruits of the contract for MLG included Iraq's duty to pay the $100,000 retainer in advance and to pay in full all MLG Litigation Invoices within sixty days of being presented with those invoices. MLG Engagement Agreement 3. Iraq's failure to pay any of the outstanding invoices might be enough on its own to find that Iraq has "destroyed or injured" MLG's right to receive the fruits of the contract. But beyond that, the *manner in which* Iraq has failed to make timely payments further implicates a breach of the Implied Covenant of Good Faith and Fair Dealing.

Initially, Iraq stalled in making payments to MLG. While Iraq did ultimately deposit $250,000 to front expenses and fund the initial retainer as required by the MLG Engagement Agreement, it did not send its first check until August 2018, which was six months after the effective date of the MLG Engagement Agreement. Pl.'s Bus. Records 1518. After sending the initial payment in August 2018, Iraq followed up with another check in November 2018. *Id.* at 1521. Iraq sent a final check in December 2018 to reimburse MLG for a sanction imposed on Iraq by this Court. *Id.* 1524.

Iraq did not substantively address MLG's inquiries about its outstanding invoices until September 2021, after MLG had threatened to file a lawsuit to recover the funds. Pl.'s Bus. Records 337–38. Rather than make a good faith effort to pay MLG, Iraq next communicated with MLG in December 2021, when it stated its belief that one invoice was "very high" and that MLG should "reduce the amount of the invoice." *Id.* at 434. After MLG brought the present lawsuit, Iraq emailed in June 2023 saying that they intended to pay MLG's fees and "start a new page" with MLG. *Id.* at 1404; Mot. for Default J. 3. However, Iraq soon reversed course and informed MLG in September 2023 that "in light of the difficult economic position," Iraq "lack[ed] necessary

funds" to pay the invoices. Pl.'s Bus. Records 1459; Mot. for Default J. 4. Iraq therefore requested

a reduction in the invoices, which MLG refused.

The initial lack of communication—despite consistent requests from MLG—and

subsequent attempts to avoid payment by Iraq represent a clear lack of good faith on Iraq's part.

The Court finds that Iraq and MoJ have breached the Implied Covenant of Good Faith and Fair

Dealing in their agreement with MLG.

### 4. Quantum Meruit

Finally, MLG asks that they be allowed to recover on a quantum meruit theory in the

alternative to a breach of contract theory. Quantum meruit is "based on the principle of unjust

enrichment and not on a contract." *TVL Assocs. v. A&M Constr. Corp.*, 474 A.2d 156, 159 (D.C.

1984). It follows logically that where a court has found that a valid contract does exist, the court

cannot find that a party is entitled to quantum meruit. Indeed, the D.C. courts have recognized

this, and they "generally prohibit litigants from asserting [quantum meruit] claims when there is

an express contract that governs the parties' conduct." *Plesha v. Ferguson*, 725 F. Supp. 2d 106,

112 (D.D.C 2010). Accordingly, the Court will deny MLG's quantum meruit claims because they

are precluded by the existence of a valid express contract.

### V.   DAMAGES

Having found that Iraq and MoJ have breached their agreement with MLG, the Court will

now determine the damages from this breach. MLG has asked this Court to award i) economic

damages in the amount of $4,075,170.65; ii) prejudgment interest in the amount of $833,462.31

plus any interest accrued since the filing of the Motion for Default; iii) collection costs in the

amount of $601,600.83; and iv) in the alternative to the expenses included in the collection costs

of $15,347.13, taxable costs in that same amount. *See* Mot. for Default J. 7–8.

The Court will grant $4,075,170.65 in economic damages, $833,462.31 in prejudgment interest plus an additional $242,603.79 in interest accrued since the filing of the Motion for Default Judgment for a total of $1,076,066.10 in prejudgment interest, and $601,600.83 in collection costs for a total award of $5,752,837.58.[5]   The Court will also award post-judgment interest in accordance with 28 U.S.C. § 1961.  Since the collection costs encompass the $15,347.13 sought as taxable costs pursuant to 28 U.S.C. § 1920, the Court will not award the money sought under that title.

### A.  Economic Damages

A creditor may recover an unpaid balance from a debtor once a court has decided that the balance is an account stated because "[t]he account stated bec[omes] a new promise and raise[s] up a new cause of action." *Gordon v. Frazier*, 13 App. D.C. 382, 386 (D.C. 1898). The Court begins with a presumption that the account stated is "*prima facie* correct." *See id.* at 387 (explaining that the defense to an action based on account stated can only challenge the action for fraud, or error and mistake).

MLG has provided a voluminous record to demonstrate the existence and timeliness of the invoices it has sent to Iraq and MoJ, and it has further provided a line-by-line accounting of legal services rendered, applicable billing rates, and expenses incurred on behalf of Iraq and MoJ. *See* Compl. ¶ 18(A)–(C); *see generally* Pl.'s Bus. Records.  Because Iraq and MoJ failed to object to any of the invoices presented to it by MLG, each of the invoices has become an account stated. And because Iraq and MoJ have not raised any arguments challenging the account stated for fraud

---

[5] All dollar amounts are in US Dollars.

or error and mistake, *Frazier*, 13 App. D.C. at 386, MLG is entitled to full payment on the account stated in its Motion for Default.[6]

**B.  Prejudgment Interest (D.C. Code § 28-3302(a))**

The District of Columbia allows for prejudgment interest to accrue on outstanding debt owed on a contract.  D.C. Code § 28-3302(a) ("The rate of interest in the District upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6% per annum.").  "[T]he trial court operates within a wide range of discretion in awarding prejudgment interest." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 550 n.6 (D.C. 1981).

MLG hired Karl Thorn, Jr. to calculate the amount of prejudgment interest owed on the $4,075.170.65 owed to it by Iraq. *See generally* Thorn Decl., ECF No. 12-6.  Thorn declared under oath that the methods he used to calculate the total prejudgment interest owed by Iraq and MoJ are "accepted in the financial industry." *Id.* ¶ 8.  Thorn took the 6% per annum interest rate and divided it by 365 to find a per diem prejudgment interest rate of 0.000164. *Id.* ¶ 8C.

The methodology used by Mr. Thorn was an appropriate way to calculate prejudgment interest on the twenty-five outstanding invoices.  As of September 30, 2023, Mr. Thorn had calculated the prejudgment interest to be $833,462.31.  Thorn Decl. ¶13(A).  He further determined that at the per diem rate of 0.000164, MLG's account stated of $4,075.170.65 would incur a daily interest charge of $668.33. *Id.* ¶13(B).  The Court confirms those calculations.

---

[6] One small accounting matter should be addressed here.  In its original Complaint, MLG sought $4,025,495.65 in economic damages on its theory of account stated.  Compl. ¶59(C).  In its Motion for Default Judgment, MLG increased its ask to $4,075,170.65.  Mot. for Default J. 49.  The difference between these numbers is attributable to simple mathematical error in the Complaint.  Upon review of all the invoices, the $4,075,170.65 number is a correct representation of the outstanding funds owed to MLG.  This was also the number used to calculate the prejudgment interest.  MLG is entitled to US $4,075,170.65 in damages on the account stated in the record.

Three hundred sixty-two days have passed since Mr. Thorn's calculation. At the daily rate of $668.33, this means that an additional $242,603.79 in prejudgment interest should be awarded. Accordingly, the Court finds that MLG is entitled to $1,076,066.10 in prejudgment interest.

### C. Collection Costs (Agreement–DC law)

MLG further contends that it is entitled to "Collection Costs," which it defines as "any costs [it] may incur in collecting the debt, including court costs, filing fees, and a reasonable attorney's fee." Mot. for Default J. ¶VI.2.A. American courts typically disfavor an award of attorney's fees for the prevailing party in litigation. "A valid contract provision, however, can authorize an attorneys' fees award." *Sundown, Inc. v. Canal Square Assocs.*, 390 A.2d 421, 430 (D.C. 1978). Furthermore, D.C. district courts tend to favor enforcing the collection-costs provisions in parties' contracts. *See, e.g., Progressive Nursing Staffers of Va., Inc. v. Capitol Med. Ctr., LLC*, No. 11-cv-2160-JDB, 2013 WL 140251, at *1 (D.D.C. Jan. 11, 2013). And in enforcing cost-collection provisions, district courts in this Circuit have broad discretion in determining the reasonableness of hourly rates sought by counsel. *Kattan by Thomas v. Dist. of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993).

The Standard Terms in the original Engagement Agreement, which were incorporated by reference into the MLG Engagement Agreement, provided that MLG "will notify [Iraq and MoJ] promptly if [their] account becomes delinquent . . . . If collection costs are necessary, [Iraq and MoJ] agree to pay [MLG] any costs [it] may incur in collecting the debt, *including court costs, filing fees, and a reasonable attorney's fee*." Initial Engagement Agreement 8–9 (emphasis added).

The Court finds that the MLG Engagement Agreement explicitly contemplated Iraq's payment of collection costs. This was a valid contract provision entered into willingly by both

MLG and Iraq.  The Court further finds that the Collection Costs of $601,600.83 incurred by MLG are reasonable and that any additional Collection Costs incurred by MLG in its effort to enforce this Order will also be awarded to MLG.

### D.  Post-Judgment Interest

MLG will also be entitled to post-judgment interest, which shall accrue beginning the date of the Order accompanying this opinion at the prevailing rate described in 28 U.S.C. § 1961. That section provides that interest shall be "allowed on any money judgment in a civil case recovered in a district court."  *Id.* § 1961(a).  The applicable post-judgment interest rate is "the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding" the judgment. *Id.*  The weekly average 1-year constant maturity Treasury yield for the week preceding this Order is 3.95%.[7]  In accordance with that section, interest shall be computed daily to the date of payment and shall be compounded annually.  *Id.* § 1961(b).

### E.  Taxable Costs

The Court's award of Collection Costs includes the $15,347.13 in taxable costs.  Therefore, this amount will not be awarded to MLG again.

## VI.   CONCLUSION

In both this case and the underlying Wye Oak litigation, Iraq has demonstrated a willingness to benefit from the services of US-based entities without paying for them.  While this Court cannot give back to MLG the time and effort it took to defend Iraq in the Wye Oak litigation or to bring this action, it can provide relief in the form of compensation.

---

[7] *See* Market Yield on U.S. Treasury Securities at 1-Year Constant Maturity, *Data Download Program*, BD. GOVERNORS FED. RESERVE SYS. (Sept. 9, 2024), https://www.federalreserve.gov/datadownload/ Preview.aspx?pi=400&rel=H15&preview=%20H15/H15/RIFLGFCY01_N.WF.

For the reasons set forth above, plaintiff's motion for default judgment and for judicial notice is **GRANTED**.  The defendants are jointly and severally liable on the account stated by MLG.  The plaintiff is awarded $4,075,170.65 in economic damages on the account stated in the record; plaintiff is further awarded $1,076,066.10 in prejudgment interest; plaintiff is also awarded $601,600.83 in collection costs.  Thus, the total damages award is $5,752,837.58.

A separate Order consistent with this Memorandum Opinion shall issue.


Date: September **27**, 2024.

Royce C. Lamberth
United States District Judge